Kevin Laukaitis
Jonathan Shub
**SHUB LAW FIRM LLC**
134 Kings Highway E., 2nd Floor
Haddonfield, NJ 08033
Tel: (856) 772-7200
Fax: (856) 210-9088
klaukaitis@shublawyers.com
jshub@shublawyers.com

*Attorneys for Plaintiff and the Proposed Classes*
[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PATRICIA DEAN, individually and on behalf of all others similarly situated, <br><br>               Plaintiff, <br>    v. <br><br> B&G FOODS, INC., <br><br>               Defendant. | CASE NO.:_____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Patricia Dean ("Plaintiff"), individually and on behalf of all others similarly situated, allege the following against Defendant B&G Foods, Inc. ("B&G" or "Defendant") on information and belief, except that Plaintiff's allegations as to her own actions are based on personal knowledge.

**INTRODUCTION**

1.     This action seeks to recover damages and remedy Defendant's continuing failure to warn individuals that certain B&G Foods, Inc. herbs and spices sold under the brand names "Spice Islands" and "Tone's," including Spice Islands' Sweet Basil, Spice Island's Ground Ginger,

and Tone's Ground Thyme (collectively, the "Products") expose consumers to heightened levels of toxic heavy metals, including lead, arsenic, and cadmium.

2.     A November 2021 report by Consumer Reports reveals that certain brands of herbs and spices, including Defendant's Products, are tainted with significant levels of toxic heavy metals.

3.     Heightened levels of toxic heavy metals in foods can cause cancer and serious and often irreversible damage to brain development as well as other serious health problems.

4.     As described more fully below, consumers who purchase the Products are injured by Defendant's acts and omissions concerning the presence of heightened levels of toxic heavy metals. No reasonable consumer would know, or have reason to know, that the Products contain heightened levels of heavy metals. Worse, as companies across the industry have adopted methods to limit heavy metals in their herbs and spices, Defendant has stood idly by with a reckless disregard for its consumers' health and well-being. As such, Plaintiff seeks relief in this action individually and as a class action on behalf of all similarly situated purchasers of the Products.

## THE PARTIES

5.     Plaintiff Patricia Dean is a resident of Homewood, Illinois, and a citizen of the State of Illinois. Ms. Dean began purchasing Defendant's Tone's Ground Ginger in or about 2019 in the State of Illinois. Her most recent purchase was in the winter of 2021 from a Walmart located in Country Club Hills, Illinois. Had Defendant disclosed on the label that the Product contained unsafe levels of toxic heavy metals, Ms. Dean would have been aware of that fact and would not have purchased the Product. After learning of the high levels of toxic heavy metals, Ms. Dean stopped purchasing the Product. However, Ms. Dean regularly visits stores where Defendant's

products are sold and remains interested in purchasing healthy, safe herbs and spices for herself and her family. She remains very much interested in purchasing Defendant's herbs and spices.

6. Defendant B&G Foods is a corporation with its headquarters and principal place of business in Parsippany, New Jersey. Defendant manufactures, markets, and sells herbs and spices under various brand names, including Spice Islands' and Tone's throughout Illinois and the United States.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section §1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class members is a citizen of a state different from the Defendant.

8. This Court has personal jurisdiction over Defendant because it has substantial aggregate contacts with this District, including engaging in conduct in this District that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, because Defendant placed the Product into the stream of commerce directed at this District, and because Defendant purposely availed itself of the laws of the United States and the State of Illinois.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is headquartered and has its principal place of business in this District, a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, and Defendant conducts substantial business in this District.

**FACTUAL ALLEGATIONS**

## I.    Lead And Arsenic Are Toxic

10.    Lead, arsenic, and cadmium are heavy metals. The harmful effects of heavy metals are well-documented, particularly on children. Exposure puts children at risk for lowered IQ, behavioral problems (such as attention deficit hyperactivity disorder), type 2 diabetes, and cancer, among other health issues. Heavy metals also pose risks to adults. Even modest amounts of heavy metals can increase the risk of cancer, cognitive and reproductive problems, and other adverse conditions. Because the average person comes into contact with heavy metals many times and from many sources, it is important to limit exposure.

11.    "No amount of lead is known to be safe."[1] Exposure to lead may cause anemia, weakness, and kidney and brain damage.[2] Lead can affect almost every organ and system in the body. Lead accumulates in the body over time, and can lead to health risks and toxicity, including inhibiting neurological function, anemia, kidney damage, seizures, and in extreme cases, coma and death. Lead can also cross the fetal barrier during pregnancy, exposing the mother and developing fetus to serious risks, including reduced growth and premature birth. Lead exposure is also harmful to adults as more than 90 percent of the total body burden of lead is accumulated in the bones, where it is stored. Lead in bones may be released into the blood, re-exposing organ systems long after the original exposure.[3]

---

[1] *See* https://www.npr.org/sections/thetwo-way/2016/08/13/489825051/lead-levels-below-epa-limits-can-still-impact-your-health (last accessed Jan. 17, 2022).

[2] Centers for Disease Control and Prevention, "Health Problems Caused by Lead," *The National Institute for Occupational Safety and Health (NIOSH)*,
https://www.cdc.gov/niosh/topics/lead/health.html#:~:text=Exposure%20to%20high%20levels%20of,a%20developing%20baby's%20nervous%20system. (last accessed Jan. 17, 2022).

[3] State of New York Department of Health, "Lead Exposure in Adults: A Guide for Health Care Providers," https://www.health.ny.gov/publications/2584.pdf (last accessed Jan. 17, 2022).

12. Arsenic is also dangerous to humans. "Arsenic is ranked first among toxicants posing a significant potential threat to human health based on known or suspected toxicity."[4] Long term exposure is linked to cardiovascular disease. Arsenic can also cause bladder, lung, liver, and skin cancer, and strokes and diabetes. Recent studies have suggested that arsenic may cause IQ deficits in children and may be harmful to fetal development as "even low concentrations of arsenic impair neurological function[.]"[5] There is "essentially no safe level" of arsenic.[6]

13. Cadmium is similarly harmful. "[A]ny cadmium exposure should be avoided."[7] Exposure to cadmium may lead to damage to kidneys, lungs, and bones.[8] "Even relatively low chronic exposure can cause irreversible renal tubule damage, potentially progressing to glomerular damage and kidney failure" and "bone loss often is seen in concert with these effects."[9] This metal is also known to cause cancer and targets the body's cardiovascular, renal, gastrointestinal, neurological, reproductive, and respiratory systems.[10]

## II. B&G's Herbs & Spices Contain Heightened Levels of Arsenic, Lead, and Cadmium

14. In November of 2021, Consumer Reports published a report titled "Your Herbs and Spices Might Contain Arsenic, Cadmium, and Lead." Employing the Analysis for Arsenic, Cadmium, Lead, and Mercury by Triple Quadruple Inductively Coupled Plasma Mass

---

[4] Christina R. Tyler and Andrea M. Allan, "The Effects of Arsenic Exposure on Neurological and Cognitive Dysfunction in Human and Rodent Studies: A Review," *Curr Environ Health Rep*. 2014; 1(2): 132-147, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4026128/ (last accessed Jan. 17, 2022).

[5] *Id.*

[6] *See* https://publicintegrity.org/environment/what-to-do-if-your-drinking-water-contains-arsenic/ (last accessed Jan. 17, 2022).

[7] M. Nathaniel Mead, "Cadmium Confusion: Do Consumers Need Protection," *Environ Health Perspect*. 2010 Dec; 118(12): A528-A534, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210/ (last accessed Jan. 17, 2022).

[8] *See* Agency for Toxic Substances and Disease Registry, "ToxFAQs for Cadmium," Toxic Substances Portal, https://wwwn.cdc.gov/TSP/ToxFAQs/ToxFAQsDetails.aspx?faqid=47&toxid=15 (last accessed Jan. 17, 2022).

[9] Mead, *supra* note 9.

[10] *See* Occupational Safety & Health, "Cadmium," https://www.osha.gov/cadmium (last accessed Jan. 17, 2022).

Spectrometry (IC-QQQ-MS), With Collision Cell, Consumer Reports determined that each of the Products contain sufficient levels of toxic metals as to render them unsafe for human consumption. Consumer Reports' samples were prepared and analyzed in accordance with the Association of Official Analytical Chemists (AOAC) Method 2015.01.

15.     Consumer Reports analyzed "126 individual products from national and private-label brands, such as Great Value (Walmart), La Flor, McCormick, Penzeys, Spice Islands, and Trader Joe's."[11]

16.     Consumer Reports determined that "[r]oughly one-third of the tested products, 40 in total, had high enough levels of arsenic, lead, and cadmium combined, on average, to pose a health concern for children when regularly consumed in typical serving sizes. Most raised concern for adults, too."[12]

17.     The authors cautioned that "just one serving—3/4 teaspoons or more—per day leaves little room for heavy metal exposure from other sources" including in "fruit juice, baby food, and rice[.]"[13] These latter food categories have also tested high for heavy metals and have been the subject of numerous lawsuits.

18.     With regards to the results, James E. Rogers, PhD, director of food safety and testing at Consumer Reports remarked that "[w]hen people think about heavy metals in their diet, if they do at all, it's probably the lead in their drinking water or arsenic in their children's fruit

---

[11] Lisa L. Gill, "Your Herbs and Spices Might Contain Arsenic, Cadmium, and Lead," *Consumer Reports* (Nov. 9, 2021), https://www.consumerreports.org/food-safety/your-herbs-and-spices-might-contain-arsenic-cadmium-and-lead/ (last accessed Dec. 21, 2021).

[12] *Id.*

[13] *Id.*

juices or cereals . . . But our tests show that dried herbs and spices can be a surprising, and worrisome, source for children and adults."[14]

19.      Concerning the source of the heavy metals in herbs and spices, Consumer Reports stated that heavy metals may get into food, "including herbs and spices, during manufacturing— from processing equipment or packaging[.]"[15]

20.      Along these lines, Consumer Reports determined that "it is possible for herb and spice companies to limit heavy metals in their products" as "[a]bout two-thirds of the spices [Consumer Reports] tested did not have concerning levels of heavy metals."[16]

21.      Yet, Defendant fails to test for heavy metals. This is despite the fact that other companies such as Bolner's Fiesta and Wadi Al Akhdar do perform such tests.

22.      Accordingly, provided this industry standard, Defendant would have had the knowledge that it could test for heavy metals, but it did not, and that it could safely remove these metals from its herbs and spices, but, again, did not.

23.      Instead, Defendant chose to ignore the health of the consuming public in pursuit of profit.

## III.   The High Presence of Toxic Heavy Metals in B&G's Herbs and Spices Far Exceeds Consumer Expectations

24.      According to Global Market Insights, "[t]he demand for spices and seasonings has increased in recent years owing to their varied nutritional benefits."[17] Indeed, "[m]ore Americans

---

[14] *Id.*

[15] *Id*.

[16] *Id.*

[17] Global Market Insights, "North America Seasonings Market to Exceed $5bn by 2027," *Press Releases* (Oct. 22, 2021), https://www.gminsights.com/pressrelease/north-america-seasonings-market?utm_source=globenewswire&utm_medium=referral&utm_campaign=Paid_globenewswire (last accessed Jan. 17, 2022).

are considering the use of spices and herbs for medicinal and therapeutic/remedy use, especially for various chronic conditions" as "[t]here is now ample evidence that spices and herbs possess antioxidant, anti-inflammatory, antitumorigenic, anticarcinogenic, and glucose-and cholesterol - lowering activities as well as properties that affect cognition and mood."[18] As such, the safety of herbs and spices that can be easily purchased to season such food, amongst others, is a material fact to consumers (such as Plaintiff and the Class members).

25.     More specifically, given the negative effects of toxic heavy metals (such as arsenic, lead, and cadmium) on child development and adult health, the presence of these substances in food is a material fact to consumers (such as Plaintiff and the Class members). Indeed, consumers— such as Plaintiff and the Class members—are unwilling to purchase foods that contains elevated levels of toxic heavy metals.

26.     Defendant knows that the safety of its herbs and spices (as a general matter) is a material fact to consumers.

27.     Defendant also knows that consumers (such as Plaintiff and the Class members) are unwilling to purchase its brands of herbs and spices that contain elevated levels of toxic heavy metals.

28.     As such, Defendant also knows that the presence of toxic heavy metals in its herbs and spices is a material fact to consumers (such as Plaintiff and the Class members).

29.     Herbs and spices manufacturers (such as Defendant) hold a special position of public trust. Consumers believe that they would not sell products that are unsafe.

---

[18] T Alan Jiang, "Health Benefits of Culinary Herbs and Spices," *J AOAC Int*. 2019 Mar 1; 102(2): 395-411, 10.5740/jaoacint.18-0418 (last accessed Jan. 17, 2022).

30.     Defendant knew that if the elevated levels of toxic heavy metals in its herbs and spices was disclosed to Plaintiff and the Class members, then Plaintiff and the Class members would be unwilling to purchase them.

31.      In light of Defendant's knowledge that Plaintiff and the Class members would be unwilling to purchase the Products if they knew that those brands of herbs and spices contained elevated levels of toxic heavy metals, Defendant intentionally and knowingly concealed this fact from Plaintiff and the Class members and did not disclose the presence of these toxic heavy metals on the labels of the Products.

32.     Defendant knew that Plaintiff and the Class members would rely upon the omissions contained on the packages of the Products and intended for them to do so.

33.     Defendant knew that in relying upon the omissions contained on the packages of the Products, Plaintiff and the Class members would view those products as being safe for consumption and Defendant's concealment of the fact that those brands of herbs and spices contained elevated levels of toxic heavy metals.

34.     Prior to purchasing the Products, Plaintiff and the Class members were exposed to, saw, read, and understood Defendant's omissions regarding the safety of their herbs and spices, and relied upon them.

35.     As a result of Defendant's concealment of the fact that its herbs and spices contained elevated levels of toxic heavy metals, Plaintiff and the Class members reasonably believed that Defendant's Products were free from substances that would negatively affect their health.

36.     In reliance upon Defendant's omissions, Plaintiff and the Class members purchased Defendant's Products.

37.     Had Plaintiff and the Class members known the truth—*i.e.*, that Defendant's brands of herbs and spices contained elevated levels of toxic heavy metals, rendering them unsafe for consumption by children and adults—they would not have been willing to purchase them at all.

38.     Therefore, as a direct and proximate result of Defendant's omissions concerning its brands of herbs and spices, Plaintiff and the Class members purchased the Products.

39.     Plaintiff and the Class members were harmed in the form of the monies they paid for the Products which they would not otherwise have paid had they known the truth. Since the presence of elevated levels of toxic heavy metals in herbs and spices renders them unsafe for human consumption, the Products that Plaintiff and the Class members purchased are worthless.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Products (the "Class"). Excluded from the Class are persons who made such purchases for purpose of resale. Plaintiff reserves the right amend the above class definition as appropriate after further investigation and discovery, including by seeking to certify a narrower multi-state class (or classes) in lieu of a nationwide class if appropriate.

41.     Plaintiff also seeks to represent a Subclass of all Class members who purchased the Products in Illinois (the "Subclass" or "Illinois Subclass").

42.     At this time, Plaintiff does not know the exact number of Class members; however, given the nature of the claims and the number of retail stores in the United States selling the Products, Plaintiff believes that the Class members are so numerous that joinder of all members is impracticable.

43.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class and Subclass that predominate over questions that may affect individual Class members include:

a.   whether the Products contain toxic heavy metals;

b.   whether Defendant's conduct is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers;

c.   whether the amount of toxic heavy metals in the Products is material to a reasonable consumer;

d.   whether Defendant had a duty to disclose that its Products had heightened levels of toxic heavy metals;

e.   whether Plaintiff and the Class members are entitled to injunctive and other equitable relief;

f.   whether Defendant failed to disclose material facts concerning the Products;

g.   whether Defendant's conduct was unfair and/or deceptive;

h.   whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiff and the Class members;

i.   whether Defendant breached implied warranties to Plaintiff and the Class members;

j.   whether Defendant the various consumer protection statutes alleged herein;

k. whether Plaintiff and the Class members have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

44.     Plaintiff's claims are typical of those of the Class members because Plaintiff, like other Class members, purchased, in a typical consumer setting, the Products and Plaintiff sustained damages from Defendant's wrongful conduct.

45.     Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests that conflict with those of the Class or the Subclass.

46.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the amount of each individual Class member's claim is small relative to the complexity of this litigation, and because of Defendant's resources, Class members are not likely to pursue legal redress individually for the violations detailed in this complaint. Individualized litigation would significantly increase the delay and expense to all parties and to the Court and would create the potential for inconsistent and contradictory rulings. By contrast, a class action presents fewer management difficulties, allows claims to be heard that would otherwise go unheard because the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

47.     The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Class and the Subclass, thereby making appropriate equitable relief with respect to the Class and the Subclass as a whole.

48.     The prosecution of separate actions by members of the Class and the Subclass would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct

12

for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the Class and the Subclass even where certain Class members are not parties to such actions.

## CAUSES OF ACTION

### COUNT I
### UNJUST ENRICHMENT
### (On Behalf of the Class)

49.     Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

50.     Plaintiff brings this claim individually and on behalf of the members of the Class and the Subclass against Defendant either together or in the alternative to the legal claims asserted above.

51.     Plaintiff and the Class and Subclass members conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

52.     Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiff and the Class and Subclass members.

53.     Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiff and the Class and Subclass members.

54.     Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

55.     Plaintiff and the Class and Subclass members are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

56.     As a direct and proximate result of Defendant's actions, Plaintiff and Class and Subclass members have suffered in an amount to be proven at trial.

## COUNT II
## BREACH OF IMPIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE
### (On behalf of the Class)

57.     Plaintiff repeats and realleges the foregoing allegations as if set forth at length herein.

58.     Plaintiff brings this claim individually and on behalf of the Class.

59.     Defendant knew that the purpose for which consumers purchased the Products was to use and consume spice(s) containing only the ingredients represented on the packages, labels, marketing, advertising, and promotions.

60.     Defendant knew that Plaintiff and similarly situated consumers trusted and relied on the accuracy of the marketing and labeling for the Products that represent the spices as safe and suitable for consumption.

61.     Plaintiff and the Class members relied on Defendant to disclose the presence of (or risk of containing) any unsafe ingredients such as heavy metals in the Products; had they known, or even suspected, that Defendant's Products were contaminated (or were at risk of being contaminated) with unsafe levels of heavy metals, they would not have purchased the subject spices.

62.     Plaintiff and the Class members were injured because Defendant's Products were not fit for the particular purpose for which they were purchased, namely to provide safe spices for use and consumption.

63.     As a proximate result of the breach of implied warranties by Defendant, Plaintiff and the other members of the Class did not receive merchantable goods that were fit for their

intended purpose. Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries and damages as detailed above. Had Plaintiff and the members of the Class known the true facts, they would not have purchased the subject Products.

<u>COUNT III</u>
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT,**
**N.J.S.A. 56: 8-1 *et seq*.**
**(On behalf of the Class)**

64.     Plaintiff repeats and restates the foregoing allegations as if set forth at length herein.

65.     Plaintiff brings this claim individually and on behalf of the Class.

66.     The New Jersey Consumer Fraud Act prohibits, *inter alia*:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . .
> N.J.S.A. § 56:8-2.

67.     Defendant's misrepresentations and false, deceptive, and misleading statements and omissions with respect to the inclusion of (or risk of inclusion of) unsafe levels of heavy metals in the Products, as described herein, constitute affirmative misrepresentations and omissions in connection with the marketing, advertising, promotion, and sale of spice products in violation of the New Jersey Consumer Fraud Act.

68.     Defendant's false, deceptive, and misleading statements and omissions were and would have been material to any potential consumer's decision to purchase the Products.

69.     Defendant failed to inform consumers that the Products contained (or at risk of containing) unsafe levels of heavy metals. That information would have been material to any consumer deciding whether to purchase the Products.

70.     Defendant made these false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements, and Plaintiff and similarly situated Class members did rely on such statements and omissions.

71.     Upon information and belief, Defendant's misrepresentations and omissions were created, approved, and implemented from its New Jersey headquarters.

72.     Plaintiff and the other members of the Class suffered an ascertainable loss as a direct and proximate result of Defendant's actions in violation of the New Jersey Consumer Fraud Act.

73.     Because of Defendant's wrongful actions, Plaintiff and the other members of the Class suffered an ascertainable monetary loss based on and measured by the price they paid for the Products, which they would not have paid in the absence of the aforesaid wrongdoing.

74.     Plaintiff and other Class members suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have purchased the Products if the true facts concerning unsafe levels of heavy metals had been known.

75.     Defendant's sale of the spices containing (or at risk of containing) unsafe levels of heavy metals for consumption was unconscionable, and the misrepresentations and omissions it made with regard to the Products were made for the sole purpose of inducing consumers to purchase the Products for use and consumption irrespective of any health consequences. Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of consumers eating the Products. Defendant is therefore liable for treble damages and punitive damages, in an amount to be determined at trial.

76.     By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the Class for trebled compensatory damages; punitive damages; attorneys' fees, and the costs of this suit. N.J.S.A. §§ 56:8-2.11, 8-2.12, 8-19.

### COUNT IV
### VIOLATIONS OF ILLINOIS CONSUMER FRUAD AND
### DECEPTIVE BUSINESS PRACTICES ACT,
### 815 Ill. Comp. Stat. §§ 505, *et seq*.
### (On behalf of the Illinois Subclass)

77.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

78.     The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq*., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

79.     Plaintiff and other members of the Illinois Subclass, as purchasers of the Products, are consumers within the meaning of the ICFA given that Defendant's business activities involve trade or commerce, are addressed to the market generally and otherwise implicate consumer protection concerns.

80.     Defendant's conduct in misrepresenting the benefits of its Products constitute the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Defendant's trade or commerce.

81.     Defendant also knowingly concealed, suppressed, and consciously omitted material facts to Plaintiff and other members of the Illinois Subclass knowing that consumers would rely on the advertisements and packaging and Defendant's uniform representations to purchase the Products.

82.     Plaintiff and the other Illinois Subclass members reasonably relied upon Defendant's representation that the Products was safe for personal use and, due to Defendant's omission, Plaintiff relied on Defendant's labeling to conclude that the Products were not contaminated with any dangerous substance, including heavy metals.

83.     Defendant's conduct, as described herein, took place within the State of Illinois and constitute unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq*.

84.     Defendant violated the ICFA by representing that the Products have characteristics or benefits that they do not have. 815 ILCS § 505/2; 815 ILCS § 510/2(7).

85.     Defendant advertised the Products with intent not to sell it as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

86.     Defendant engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

87.     Defendant engaged in misleading and deceptive advertising that represented that the Products were safe. Defendant chose to label the Products in this way to impact consumer choices and gain market dominance, as it is aware that all consumers who purchased the Products were exposed to and would be impacted by its omission and would reasonably believe that the Products were safe for consumption and did not contain any dangerous contaminants, including heavy metals. However, the Products are not safe, and are contaminated with heavy metals.

88.     Defendant intended that Plaintiff and each of the other Illinois Subclass members would reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the true nature of the Products.

89.     Defendant's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass members to be deceived about the true nature of the Products.

90.     Defendant's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass members to be deceived about the true nature of the Products.

91.     As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff and the Illinois Subclass members have suffered ascertainable loss of money caused by Defendant's misrepresentations.

92.     Had they been aware of the true nature of the Products, Plaintiff and Illinois Subclass members either would have paid less for the Products or would not have purchased them at all.

93.     Plaintiff and the Illinois Subclass members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs and attorney's fees, under sections 815 ILCS 505/10a of the ICFA. Plaintiff and the Illinois Subclass members are also entitled to injunctive relief, seeking an order enjoining Defendant's unfair and/or deceptive acts or practices.

### <u>COUNT V</u>
### VIOLATIONS OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT, 815 Ill. Comp. Stat. §§ 505, *et seq.* (On behalf of the Illinois Subclass)

94.     Plaintiff, individually and on behalf of the Illinois Subclass, repeats and re-alleges all previously alleged paragraphs, as if fully alleged herein.

95.     Defendant is a "person" as defined by 815 Ill. Comp. Stat. § 510/1(5).

96.     Defendant engaged in deceptive trade practices in the conduct of its businesses, in violation of 815 Ill. Comp. Stat. § 510/2(a) by making misrepresentations and false statements concerning the presence of heavy metals in its Products.

97.     Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

98.     The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and the Illinois Subclass members that they could not have reasonably avoided; this substantial injury outweighed any benefits to consumers or to competition.

99.     As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and the Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

100.    The Plaintiff and the Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all members of the proposed classes the following relief against Defendant:

a.  That the Court certify the Class and Subclass under Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiff as Class Representative and her attorneys as Class Counsel to represent the members of the Class and Subclass;

b.  That the Court declare that Defendant's conduct violates the statutes referenced herein;

20

c.  That the Court preliminarily and permanently enjoin Defendant from conducting business through the unlawful, unfair, or fraudulent business acts or practices, untrue, and misleading labeling and marketing and other violations of law described in this Complaint;

d.  That the Court order preliminary and injunctive relief requiring Defendant to disclose that its products contain heightened levels of toxic heavy metals;

e.  That the Court order Defendant to implement whatever measures are necessary to remedy the unlawful, unfair, or fraudulent business acts or practices, untrue and misleading advertising, and other violations of law described in this Complaint;

f.  That the Court order Defendant to notify every individual and/or business who purchased the Products of the pendency of the claims in this action to give such individuals and businesses an opportunity to obtain restitution from Defendant;

g.  That the Court grant Plaintiff's reasonable attorneys' fees and costs; and

h.  That the Court grant such other and further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues in this action so triable of right.

Dated:  March 11, 2022                     Respectfully submitted,

*/s/ Kevin Laukaitis*
Kevin Laukaitis
Jonathan Shub
**SHUB LAW FIRM LLC**
134 Kings Highway E., 2nd Floor
Haddonfield, NJ 08033
Tel: (856) 772-7200
Fax: (856) 210-9088
klaukaitis@shublawyers.com
jshub@shublawyers.com

Gary E. Mason*
Danielle Perry*
**MASON LIETZ & KLINGER, LLP**
5101 Wisconsin Avenue NW, Suite 305
Washington, DC 20016
Tel: 202-640-1168
Fax: 202-429-2294
gmason@masonllp.com
dperry@masonllp.com

L. Timothy Fisher*
Sean L. Litteral
**BURSOR & FISHER, P.A.**
1990 North California Blvd, Suite 940
Walnut Creek, CA 94596
Tel: (925) 300-4455
Fax: (925) 407-2700
ltfisher@bursor.com
slliteral@bursor.com

Lori G. Feldman*
**GEORGE GESTEN MCDONALD, PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Tel: (833) 346-3587
lfeldman@4-justice.com
mailto:eservice@4-justice.com

Janine L. Pollack
**CALCATTERA POLLACK LLP**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Tel: (212) 899-1765
Fax: (332) 206-2073
mailto:jpollack@calcaterrapollack.com

*pro hac vice to be filed

*Attorneys for the Plaintiff and the Putative Classes*